IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA MASUPHA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  06 C 5020 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| NORMAN Y. MINETA, Secretary of the U.S. | ) | |
| Department of Transportation, FEDERAL | ) | |
| AVIATION ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Masupha ("Masupha") is a black female of South African decent who has been employed for nearly nineteen years by the U.S. Department of Transportation ("DOT"), Federal Aviation Administration ("FAA").  After a series of workplace incidents involving Masupha, her supervisor, Bernadette O'Brien ("O'Brien") suspended her for five days.  Masupha filed this action against Norman Y. Mineta ("Mineta"or "Defendant") in his official capacity as the Secretary of the DOT pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000(e) *et seq.* contending that she suffered an adverse employment action–suspension–on account of her sex, race, age, and national origin; and that O'Brien's reason for suspending her was to retaliate against her for having previously opposed the DOT's alleged discriminatory practices.

Mineta moves for summary judgment on Masupha's Title VII claim claiming that: 1) Masupha has presented no direct evidence of sex, race, age, or national origin discrimination or retaliation; 2) Masupha cannot establish a *prima facie* case of sex, race, age, or national origin discrimination or retaliation because she has not identified any similarly-situated employees outside

1

of the protected class who were treated more favorably; and 3) even if Masupha could establish a *prima facie* case of sex, race, age, or national origin discrimination or retaliation, there were legitimate, non-discriminatory reasons for her suspension.

Masupha has failed to present any direct evidence of sex, race, age, or national origin discrimination or retaliation, and has not demonstrated the existence of a genuine issue of material fact bearing on whether Defendants treated any similarly-situated employees outside of the protected class more favorably than she, or whether Defendant's articulated reasons for suspending Masupha for five days were a pretext for discrimination or retaliation. Accordingly, Defendant's Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Masupha, a black female of South African decent, is a personnel management specialist for the FAA. Pltf. 56.1 Resp. ¶ 1.[1] Masupha received a bachelor's degree in 1989 and a master's degree in Human Resource Development in 1999. Def. 56.1 Resp. ¶ 36. O'Brien is Masupha's direct supervisor. Def. 56.1 Resp. ¶ 37; Def. Mtn.[2]

In April 2005, Masupha participated in Air Traffic Controller Specialist ("ATCS") hiring process. Def. 56.1 Resp. ¶ 42; Ex. 2. She was to fill 18 ATCS vacancies for those candidates who would be required to train at the FAA Academy from May 19, 2005 to August 3, 2005 and seven additional ATCS vacancies for the September 15, 2005 to December 1, 2005 Academy class. *Id*. FAA policy requires that an ATCS receive medical clearance prior to being hired. Pltf. 56.1 Resp.

---

[1] Citations to "Plaintiff's Local Rule 56.19b) Statement in Opposition to Defendant's Statement of Uncontested Facts" have been abbreviated to "Pltf. 56.1 Resp." Citations to Defendants' Response to Plaintiff's Local Rule 56.1(b)(3)(B) Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp.".

[2] O'Brien's race and national origin is unclear from the parties' Rule 56 Statements.

¶ 5[3].  The policy is set forth in the Office of Professional Management ("OPM") Qualification

Standards Operating Manual (the "Manual").  Ex. I, p. 1.  Masupha had recently received specific

training DOT procedures associated with hiring Air Traffic Control Specialists.  Def. 56.1 Resp. ¶

43; Pltf. 56.1 Resp. ¶ 16.

On April 29, May 13, and May 19, 2005, Masupha extended final job offers to eight

applicants for ATCS positions without ensuring that those candidates had received the required

medical clearance.  Pltf. 56.1 Resp. ¶ 6.[4]  On May 18, 2005, Masupha, O'Brien and FAA personnel

met to discuss Academy applicant Jeremy Braughton's ("Braughton") status.  Pltf. 56.1 Resp. ¶ 7.

During the meeting, O'Brien learned that Masupha gave Braughton a firm job offer and scheduled

Braughton to start training at the FAA Academy on May 19, 2005 even though Braughton had not

yet obtained the required medical clearance.  Pltf. 56.1 Resp. ¶ 7.

The following day, O'Brien met with Masupha to discuss the situation and admonished

Masupha for offering Braughton a job before obtaining the required medical clearance.  Pltf. 56.1

Resp. ¶ 8.  Additionally, O'Brien admonished Masupha for concealing her mistake for two weeks.

*Id.*; Ex. I.  Because Masupha concealed her mistake, O'Brien attended the May 18, 2005 meeting

under the mistaken belief that Braughton had obtained medical clearance prior to Masupha's offer.

*Id.*  O'Brien told Masupha "...this should never happen again" and that "once was more than

enough."  O'Brien also said that she " expected to be told everything" and that "matters like this

_____

[3] The parties dispute whether the policy that required medical clearance to be obtained prior to hiring
candidates for the Academy was a *new* policy.  Def. 56.1 Resp. ¶ 44.  Nevertheless, Masupha concedes that
the policy was in place at the time she hired the candidates and does not dispute that it was in place during
her ATSC hiring training.  Ex. 2.

[4] Masupha's denial of Paragraph 6 is improper because it does not refute that the Notice sets forth
that she gave final job offers to eight ineligible ATCS applicants.

must be brought to [my] attention immediately." Pltf. 56.1 Resp. ¶ 8.

On May 24, 2005, O'Brien and Masupha attended a meeting with Security and Aviation Medicine ("SAM") to discuss suitability determination procedures. Pltf. 56.1 Resp. ¶ 9. During this meeting, the fact that Masupha hired Braughton before he was medically cleared was addressed. Believing that Masupha's mistake was an isolated event, O'Brien supported Masupha in front of the SAM stating that she would never knowingly hire an individual that did not posses the necessary clearance. *Id*. Masupha sat silently during the May 24, 2005 meeting knowing that she had hired seven additional candidates who had not obtained the required medical clearance and Masupha did not disclose this fact to O'Brien or any other FAA employee. *Id*.

Masupha's conduct came to light on the following day when the Regional Flight Surgeon, Dr. Kowalski, told O'Brien that Masupha had hired an additional seven individuals who did not have medical clearance. Pltf. 56.1 Resp. ¶ 10. O'Brien was forced to call three or four candidates and rescind their job offers. Pltf. 56.1 Resp. ¶ 11. One of the candidates drove from Montana to Oklahoma City to attend the FAA Academy and O'Brien was forced to call the candidate less than 24 hours before he was to begin class to rescind his job offer. *Id*. Dr. Kowalski delayed telling O'Brien about Masupha's conduct because he wanted to give Masupha the opportunity to tell O'Brien. When the actual start dates were approaching, Dr. Kowalski could delay no longer and he was forced to disclose this information to O'Brien. *Id.*

On July 5, 2005, O'Brien drafted a Notice of Proposed Suspension ("Notice") to Masupha setting forth her basis for suspending her for ten-days. Pltf. 56.1 Resp. ¶ 4. O'Brien intended to suspend Masupha for negligent work performance and for failure to follow instructions from a superior official. *Id.* As to the former, O'Brien specifically charged Masupha with failing to adhere

to FAA Policy requiring ATCS candidates to receive medical clearance prior to extending job offers to them. *Id.* Regarding the latter charge, O'Brien specifically charged Masupha with concealing her mistakes from O'Brien on two occasions–one occurring after O'Brien instructed her to bring similar matters to her attention immediately. *Id.*

O'Brien allowed Masupha time to respond to the Notice in writing and on August 2, 2005, Masupha submitted a seven-page written response that Masupha characterizes as a complete statement of the reasons she believed that her suspension was unfair.[5] Pltf. 56.1 Resp. 13, 14. Masupha did not dispute any of the facts set forth in the Notice. Pltf. 56.1 Resp. ¶ 15. Rather, Masupha apologized for her mistakes and stated that they were not intentional. *Id.* Although Masupha acknowledged that she had received specific training in hiring Air Traffic Control Specialists she claimed that her training was short and that she "may have missed or overlooked the instructions that clearances must be received." Pltf. 56.1 Resp. ¶ 16. Masupha also conceded that she failed to tell O'Brien about the seven additional job offers to candidates who were not medically cleared but stated that she did so because the "situation was very tense," she wanted to inform her trainer first, and because she was afraid that "O'Brien would be angry". Pltf. 56.1 Resp. ¶ 17. Masupha pleaded financial hardship, asked O'Brien to consider reducing the proposed ten-day suspension, and promised that the mistake would not happen again. *Id.*

---

[5] Paragraphs 44-60 of Plaintiff's Statement of Additional Facts were unsupported by admissible evidence and are stricken. Specifically, the only support Masupha offered in support of the facts set forth in Paragraphs 44-60 were her August 2, 2005 letter to O'Brien attached as Exhibit 2. Exhibit 2 is hearsay when offered by Masupha and an admission by a party opponent when offered by the Defendants. *See Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay . . . to oppose a motion for summary judgment."). Masupha's statements in her letter are out-of-court statements offered by Masupha for the truth of the matter asserted and, therefore, may not be relied upon by Masupha to resist summary judgment. See Fed. R. Evid. 802; *Galdikas v. Fagan,* 342 F.3d 684, 695 (7th Cir. 2003); *Bombard,* 92 F.3d at 562. Paragraph 65 is also inadmissible hearsay. Moreover, some of the statements set forth in Paragraphs 44-60 contain double hearsay.

O'Brien reduced Masupha's suspension from ten days to five days (two non-work days and three pay days) on the basis of Masupha's financial situation. Pltf. 56.1 Resp. 18. Although O'Brien found that the negligent work performance charge was "supported by a preponderance of the evidence" she chose to give Masupha the "benefit of the doubt" and withdrew the charge. *Id.* O'Brien, however, could not overlook Masupha's failure to disclose the fact that she hired seven other candidates having warned her to on May 18, 2005 to bring similar matters to her attention immediately. Accordingly, O'Brien upheld the failure to follow directions charge stating, "[w]ithholding serious issues from me in order to avoid admonishment is, at best, irresponsible behavior not expected of a Specialist. The acceptance of consequences is part of taking responsibility. Your reply indicates that you made a choice to take actions which were contrary to my instructions." Pltf. 56.1 Resp. ¶ 19.[6] Masupha was suspended for five days in September 2005.

Masupha identified Cindy Warrender ("Warrender"), Gary Yackle ("Yackle"), Diana Maiello ("Maiello"), Deborah Larson ("Larson"), Gabriele Weiman ("Weiman"), Sandra Granger ("Granger"), and Jennifer Scottberg ("Scottberg") as being individuals who are similarly situated to Masupha, but who were treated more favorably. Pltf. 56.1 Resp. ¶ 23. Warrender is a white female and is a personnel management specialist. Pltf. 56.1 Resp. ¶ 24. In May 2005, Warrender and Masupha mistakenly set an individual's salary at the wrong level. *Id.* Neither Warrender or Masupha were disciplined for the error. *Id.*

---

[6] Masupha's response letter stated that she was afraid that O'Brien would "yell and scream" at her if she told her about hiring the seven additional uncleared candidates. Pltf. 56.1 Resp. ¶ 17. O'Brien denied ever yelling at Masupha and Masupha later testified that when she used the word "yell" she meant the way O'Brien speaks and not the volume of her voice. Pltf. 56.1 Resp. ¶ 20. O'Brien's voice is "very soft" and Masupha describes O'Brien as "soft-spoken" but also that when O'Brien says something "it just goes through your heart because of the way she says it...she'll be yelling but very softly, but you will get the message. You, know." *Id.*

Maiello and Larson are female management specialists.[7] Pltf. 56.1 Resp. ¶ 25. Although she has no personal knowledge regarding their conduct, Masupha "believes" that Warrender, Maiello, and Larson made an error involving setting an individual's salary at the wrong level because she heard O'Brien orally reprimand them at a meeting. *Id.*; Def. 56.1 Resp. ¶ 63. Although O'Brien warned Warrender, Maiello and Larson that she was going to suspend or reprimand them for their conduct, she took no formal action against them. Def. 56.1 Resp. ¶ 63.

Weiman, Scottberg, and Granger are female personnel management specialists. Pltf. 56.1 Resp. ¶ 26. Although Masupha "caught" Weiman, Scottberg, and Granger making unspecified mistakes she did not report their mistakes to O'Brien.[8] *Id.* Yackle is a white male personnel management specialist.[9] Pltf. 56.1 Resp. ¶ 27. Yackle hired an individual as a full time employee when that individual should have been hired on a temporary basis. Pltf. Resp. 56.1 ¶ 27. David Pinner ("Pinner") was Yackle's supervisor at the time and did not discipline Yackle. *Id.* In 2004, O'Brien disciplined Yackle for careless work performance.[10] Pltf. 56.1 Resp. 28.

Although O'Brien is a strict supervisor to all of her employees, Masupha feels that O'Brien treats higher graded employees more respectfully and that she is particularly hard on white men. Pltf. 56.1 Resp. ¶ 30. Masupha believes that O'Brien degraded her more than her white subordinates "because she was so mad at [Masupha]". Def. 56.1 Resp. ¶ 68. Masupha also feels that O'Brien

---

[7] Masupha does not identify Maiello's and Larson's races, ages, or countries of origin.

[8] Neither party identifies the nature of the alleged mistakes in its Rule 56 Statements; nor does Masupha identify their race, age, or countries of origin.

[9] Masupha does not identify Yackle's race, age or national origin.

[10] It is unclear from the parties' Rule 56 Statements what conduct precipitated O'Brien's decision to discipline Yackle.

spoke to her differently than to other white senior specialists and that she would roll her eyes when she spoke at meetings. Pltf. 56.1 Resp. ¶¶ 69, 72. O'Brien criticized Masupha's work and her criticism was "hurtful".[11]  *Id*.  On one occasion, O'Brien told Masupha that she did not act like a personnel management specialist, that she was irresponsible, and that she didn't know what she was doing. Def. Resp. 56.1 ¶ 67, 70.

In August 2001, Masupha filed an administrative complaint alleging that Defendant discriminated against her on the basis of race and national origin, and that she was retaliated against for complaining of discrimination in the workplace. Pltf. 56.1 Resp. ¶ 33. In November 2004, Masupha filed another administrative complaint on the basis of race, national origin, retaliation, and denial of promotion. *Id.* The DOT denied her complaint on the basis that Masupha failed to timely pursue her administrative remedies. *Id.* Masupha filed suit in federal court in May 2005 and the district court dismissed her claim on January 10, 2006 as untimely. *Id.* Five months later, on September 18, 2006, Masupha filed this complaint alleging that Defendants discriminated against her on the basis of her sex, age, race, national origin, and retaliated against her for filing previous complaints with the Equal Employment Opportunity Commission ("EEOC"). According to Masupha's most recent complaint, Defendants suspended her for five days on the basis of her sex, age, race, and national origin and created a hostile work environment during the period of August 2004 through September 2005. Pltf. 56.1 Resp. 34.

## **STANDARD OF REVIEW**

---

[11] In Masupha's answers to interrogatories regarding the basis of her hostile work environment claim, she detailed numerous allegations that occurred over a period of more than ten years. However, neither parties' Rule 56 Statements of Fact sets forth the allegations contained within Masupha's Answers to Interrogatories. Pltf. 56.1 Resp. ¶ 29.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

Masupha alleges sex, race, age, and national origin discrimination and retaliation by the Defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Title

VII also prohibits an employer from discriminating against any employee for having opposed any practice made an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a).

I.     *Discrimination on the basis of Sex, Race, Age, and National Origin*

To overcome Defendant's motion for summary judgment, Masupha may proceed under either the direct or indirect method of proving that Defendant took an adverse employment action against her because of her sex, race, age, and national origin.  Under the direct method, Masupha must show, using either direct or circumstantial evidence, that the motivation behind her termination was sex, race, age, and national origin.  *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).  Because the direct method of proving racial discrimination "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," this option is not available to many aggrieved employees. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Masupha fails to identify any direct evidence of sex, race, age, and national origin discrimination. Accordingly, if she is to survive Defendant's motion for summary judgment, she must do so under the indirect method.

When a plaintiff lacks direct evidence of discriminatory motive, courts apply the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, Masupha must first present a *prima facie* case of discriminatory discharge by showing that: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably than she was treated.  *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006) (citing *McDonnell Douglas*). This *prima facie* showing creates an initial

presumption that the employer unlawfully discriminated against its employee. *See St. Mary Honor Center v. Hicks*, 509 U.S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) ("To establish a presumption is to say that a finding of the predicate fact (here, the *prima facie* case) produces a required conclusion in the absence of explanation (here, the finding of unlawful discrimination).") If Masupha can demonstrate such a *prima facie* case, the burden shifts to Defendant to produce a legitimate, non-discriminatory reason for Masupha's suspension. *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *see also St. Mary Honor Center*, 509 U.S. at 509 (observing that the employer's burden is one of production only and not persuasion). If the Defendant can produce such a reason, Masupha has an opportunity to demonstrate that the articulated reason is, in fact, a pretext. *Paul*, 465 F.3d at 794. In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Defendant concedes for the purpose of summary judgment that Masupha is a member of a protected class[12], and that she suffered an adverse employment action when she was suspended for five days. Defendant argues, however, that Masupha has not proven that she met the FAA's legitimate expectations or that Defendant treated any similarly situated employees who are not part of a protected class differently than they treated her.[13]

A.  Masupha Did Not Meet Defendant's Legitimate Expectations.

In order to make out her *prima facie* case, Masupha must demonstrate that she met Defendant's legitimate expectations. The record reveals that she did not. It is undisputed that at the relevant time period, FAA policy required that ATCS candidates receive medical clearance prior to

---

[12]  Masupha did not put forth evidence of her age in her Statement of Additional Facts.

[13]  In this case, those that are outside the protected class include employees that are male, non-black, outside the protected age group, and not of South African decent.

receiving firm job offers. Masupha had recently completed the Air Traffic Academy hiring training and received specific training in hiring Air Traffic Control Specialists which training included the requirement that job offers only be extended to prospective employees that had undergone the requisite medical testing. Nonetheless, Masupha extended firm job offers to prospective Air Traffic Control Specialists who did not have the required medical clearance. Masupha's explanation for her failure to adhere to FAA Policy was that her training was short and that she "may have missed or overlooked the instructions that clearances must be received." Regardless, Masupha intentionally concealed her violations for two weeks until they were finally revealed during the May 18, 2005 meeting regarding Candidate Braughton.

When O'Brien first learned of Masupha's error, she privately admonished her for failing to adhere to FAA Policy and for intentionally concealing her violations for two weeks. Yet, Masupha repeated the same violation days later and hired seven candidates without the proper medical clearance. Despite having been told only five days prior of her obligation to raise with her supervisor, Masupha concealed her violation during the May 24, 2005 meeting with SAM. Masupha sat silently during the SAM meeting as O'Brien defended her conduct knowing that she had repeated the same conduct in violation of her training and the FAA policy. Masupha's misconduct was not revealed until Dr. Kowalski was forced to tell O'Brien the following day. By that time, candidates were already en route to the FAA Academy having received offers of employment unwittingly in violation of FAA policy.

Therefore, the record reveals that Masupha was not suspended until she blatantly ignored O'Brien's instructions and repeated the same error for which she was admonished on May 19, 2005. Indeed, O'Brien supported Masupha during the SAM meeting because she was under the mistaken

belief that Masupha's mistake was an isolated event. Masupha's only explanation for concealing the fact that she had again failed to adhere to FAA policy was that she was afraid that O'Brien would yell at her. Accordingly, the record reflects that Masupha was an insubordinate employee who was not meeting Defendant's legitimate expectations, that she was repeatedly informed of her failure to do so, and that she ignored O'Brien's instructions and continued to conceal her misconduct. *See Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 139 (7th Cir. 1994) ("[a]n employee who is insubordinate does not perform her job satisfactorily."); *Cowan v. Glenbrook Security Srvs, Inc.*, 123 F.3d 438, 444-46 (7th Cir. 1997) (Employee who is habitually tardy and disregards employer's repeated warnings is not performing job satisfactorily.).

Moreover, the record further reveals that Defendant's expectations were reasonable in light of the FAA's written policy requiring Specialists such as Masupha to ensure that ATCS candidates receive medical clearance prior to receiving firm job offers. As such, Masupha's errors were anything but trivial in light of the undisputed fact that candidates were already en route to the Academy when O'Brien was forced to call and rescind their job offers. Therefore, Masupha cannot demonstrate that she met her employer's legitimate expectations.

B.    Similarly Situated Employees

Masupha has also failed to prove that Defendant treated any similarly situated employee outside of the protected class more favorably in making adverse employment decisions. "[I]n disciplinary cases -- in which a plaintiff claims that he was disciplined more harshly than a similarly situated employee based on some prohibited reason -- a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had

13

engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted). The similarly situated inquiry is not rigid or inflexible; it considers all relevant factors, the number of which will depend on the context of the particular case. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). With respect to those relevant factors, "an employee need not show complete identity in comparing [herself] to the better treated employee, but [she] must show substantial similarity." *Id.*

Although it is Masupha's burden to do so, she failed to identify any similarly situated employee not in the protected class who received more favorable treatment than she did after engaging in similar conduct. *See Burks*, 454 F.3d at 750-51. While Warrender, Yackle, Maiello, Larson, Weiman, Granger, and Scottberg share Masupha's title, Masupha failed to present evidence that each of them fell outside of the protected class. Masupha fails to identify a single similarly situated employee in any position at the DOT who was engaged in conduct similar to hers. None of the aforementioned individuals hired candidates without the required medical clearance and concealed his or her mistakes from their supervisors. And, no reasonable juror could conclude that the conduct of Warrender, Yackle, Maiello, Larson, Weiman, Granger, and Scottberg rose to the level of Masupha's in that they did not blatantly ignore their supervisor's instructions or repeatedly violate FAA policy.

Moreover, the evidence does not show that the individuals were treated more favorably. Although Warrender and Masupha set an individual's salary at the wrong level and neither was disciplined the mistake was not intentional, less significant and had less serious consequences. Further, unlike the misconduct committed by Masupha which was intentional and then re-committed

after warnings, the other individuals made mistakes. Maiello and Larson committed the same error and, like Warrender and Masupha, neither was disciplined. Although Masupha testified that Weiman, Scottberg, and Granger made mistakes, Masupha fails to present evidence of the exact nature of their mistakes, and therefore, it can not be said that their conduct was similar to her conduct. Nor did Masupha put forth evidence that the mistakes made by Weiman, Scottberg, and Granger were brought to O'Brien's attention. Finally, Yackle wasn't supervised by O'Brien when he hired an individual on a full-time as opposed to a part-time basis. After O'Brien began supervising Yackle, she disciplined him for negligent work performance.

Masupha has not demonstrated that she met Defendant's legitimate expectations or that Defendant treated any similarly situated employees outside of the protected class more favorably than she was treated. Accordingly, she has failed to make out her *prima facie* case of discrimination and cannot survive summary judgment on this claim. Because Masupha failed to establish a *prima facie* case of race discrimination, it is not necessary for this Court to reach the issue of pretext. *Burks*, 464 F.3d at 754 (*citing Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). Nevertheless, the Court addresses the issue briefly for the sake of completeness.

C.     Pretext

Even if Masupha had established a *prima facie* case for discrimination, Defendant would have the opportunity to rebut that *prima facie* case by articulating a legitimate, nondiscriminatory reason for terminating her. *McDonnell Douglas*, 411 U.S. at 802. In other words, even if Masupha had established conclusively that the decision to suspend her was motivated in part by discrimination, Defendant could still avoid liability by demonstrating that the same decision would have been made despite the alleged unlawful motive. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691,

696 (7th Cir. 2006) (*citing Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)). The Notice set forth O'Brien's reasons for suspending Masupha, namely, Masupha's negligent work performance and the fact that she concealed her mistakes from her supervisor. O'Brien later gave Masupha the "benefit of the doubt" and withdrew the negligent work performance charge but maintained the failure to follow directions charge because she could not overlook the fact that Masupha concealed the fact that she hired seven other candidates after O'Brien warned her to bring mistakes to her attention immediately. Therefore, Mineta's reasons for suspending Masupha were based upon her failure to follow directions and not because of her sex, race, age, or national origin. Because this nondiscriminatory reason has been proffered, the burden shifts to Masupha to establish that reason as a pretext. *Paul*, 465 F.3d at 794.

In order to show pretext, Plaintiff must demonstrate that Defendant's proffered motivation for her suspension "is a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Courts are "not concerned with whether or not the employer's actions were mistaken, ill considered or foolish, so long as the employer honestly believed those reasons." *Burks*, 454 F.3d at 754 (*citing Jordan*, 205 F.3d at 343) (internal quotations omitted). An employee cannot "avoid summary judgment by merely claiming that a jury could disbelieve the employer's reason." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002). Instead, an employee must put forth evidence suggesting that the employer itself did not believe the proffered reasons for termination. *Burks*, 454 F.3d at 754-55.

In this case, Masupha has not demonstrated that Defendant's proffered motive for her suspension - concealing her mistakes from O'Brien - is a pretext. Masupha has put forth no evidence that Defendant did not believe the proffered reason for termination. To the contrary,

Masupha concedes that she hired candidates who had not received medical clearance and concealed her mistakes from O'Brien even after having been advised that "matters like this must be brought to [O'Brien's] attention immediately." Even if she had made out her *prima facie* case, Masupha would still be required to set forth specific evidence demonstrating that Defendant's proffered reason for her suspension was a lie; having failed to do so, Masupha cannot show pretext, and thus her case cannot survive summary judgment on this claim. *Id.* at 755.

## II.    *Retaliation Claim*

As with her sex, race, age, and national origin discrimination claim, Masupha may overcome Defendant's motion for summary judgment with respect to her retaliation claim by proceeding under either the direct or indirect methods. *Humphries*, 474 F.3d at 404. Masupha does not present any direct evidence of retaliation. Instead, she proceeds under the indirect method.

Masupha's retaliation claim also fails using the indirect approach. Masupha must demonstrate that after she complained of discrimination, she, and not any other similarly situated employee who did not complain, was subject to an adverse employment action even though she was performing up to Defendant's legitimate expectations. *Roney v. Illinois D.O.T.*, 474 F.3d 455, 459 (7th Cir. 2007) (*citing Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006)). The failure to satisfy any one element of this *prima facie case* is fatal to an employee's retaliation claim. *Id.*; *citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)).

There is no dispute that Masupha engaged in protected activity when she filed EEOC charges of discrimination and retaliation against Defendant or that she suffered an adverse employment action when she was suspended for five days. However, for the reasons previously stated, Masupha fails to demonstrate that she was performing up to Defendant's legitimate expectations and failed

to show that Warrender, Yackle, Maiello, Larson, Weiman, Granger, and Scottberg were similarly situated to her with respect to performance, qualifications, and conduct. To the contrary, the evidence showed that their conduct differed from Masupha's and that they were treated similarly to her after engaging in identical conduct such as setting the wrong salary. Additionally, Masupha did not put forth evidence that the aforementioned individuals did not complain about discrimination, but rather, she proffered evidence that "[a] number of other black employees under the same management team as [she] filed complaint of discrimination based on race." Def. 56.1 Resp. ¶ 73. Therefore, the record does not show that after complaining of discrimination, only Masupha, and not any other similarly situated employee who did not complain of discrimination, was subject to an adverse employment action.

Moreover, Masupha failed to put forth evidence that her suspension was casually connection to her previously filed EEO complaints. Masupha filed complaints in August 2001, November 2004, and May 2005 and Masupha was suspended in September 2005. *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995) (A "substantial time lapse . . . is counter-evidence of any causal connection."); *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001) (time lapse of one year constitutes counter-evidence of any causal connection between protected activity and retaliation); *accord Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918-19 (7th Cir. 2000) (three months); *see Filipovic v. K&R Express Sys., Inc*., 176 F.3d 390, 399 (7th Cir. 1999) (four months). Masupha cannot prevail on her retaliation claim and Defendant is entitled to judgment as a matter of law.

III.     *Harassment on the basis of sex, race, age, national origin and retaliation under Title VII*

        Masupha claims that Defendant harassed her because of her sex, race, age, national origin,

and in retaliation for filing prior EEO complaints. Title VII is violated "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21(1993); (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "'Mere utterance of an... epithet which engenders offensive feelings in an employee,' does not sufficiently affect conditions of employment to implicate Title VII." *Id.* at 370 (quoting *Meritor*, 477 U.S. at 67); *see also Dey v. Colt Construction & Development Co.*, 1993 WL 105437 *2 (ND. Ill. April 7, 1993). If the conduct is not severe or so pervasive as to create an environment that a reasonable person would find hostile or abusive, then Title VII has not been violated. *Id.* In determining whether an environment is hostile or abusive, a variety of factors are considered including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Saxton v. American Telephone & Telegraph*, 10 F.3d 526, 534 (7th Cir. 1993) (quoting *Harris*, 114 S. Ct. at 371).

Here, Masupha posits vague evidence that O'Brien degraded her more than her white subordinates, spoke differently to her than other white senior specialists, and criticized her work. Masupha's vague allegations are not sufficient evidence to support a hostile and abusive work environment claim on the basis of sex, race, age, national origin, or in retaliation for previously filed complaints of discrimination. *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006) ("Specific facts are required; conclusory allegations will not do.") Foremost, Masupha failed to put forth evidence that O'Brien's behavior was frequent in nature. Moreover, although Masupha argues in her Response that she "clearly perceived her work environment to be intimidating, hostile or abusive"

Masupha must demonstrate that her work environment was both objectively and subjectively offensive to survive summary judgment. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir.2004). Even considering Masupha's allegations in the light most favorable to her, O'Brien's conduct was not severe and pervasive enough to create an environment that a reasonable person would find it to be hostile or abusive. Finally, the record is free of any evidence of a connection between O'Brien's criticism of her work and the heightened scrutiny that she endured and her sex, race, age, or ethnicity– as opposed to the quality of her work.

Contradicting her own claims, Masupha conceded that O'Brien is a strict supervisor to all of her employees contradicting her hostile work environment on the basis of age and retaliation claims. She also conceded that O'Brien is particularly hard "white males" thereby contradicting her hostile work environment on the basis of race and sex claims. Masupha puts forth no evidence regarding O'Brien's conduct toward younger employees or employees that are not of South African decent. Again, Masupha failed to present evidence that her suspension and/or O'Brien's conduct was close in time to her previously-filed EEO complaints. Indeed, Masupha does not specify when O'Brien "downgraded" her in relation to her prior EEO complaints. In short, Masupha failed to put forth sufficient evidence to overcome Defendant's Motion for Summary Judgment against her hostile work environment claim.

IV. *Conclusion and Order*

Reviewing all of the evidence in the record and drawing all reasonable inferences in favor of Masupha, there is no genuine issue as to any material fact that Defendant treated similarly-situated employees outside of the protected class more favorably than Masupha or that Defendant's articulated reason for suspending Masupha was a pretext for discrimination. Further,

there is no genuine issue as to any material fact that after Masupha complained of discrimination she, and not any other similarly situated employee who did not complain, was subject to an adverse employment action. Wherefore, Defendant's Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   March 13, 2008